***********
The undersigned reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Chapman. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; and having reviewed the competent evidence of record, the Full Commission affirms the Opinion and Award of Deputy Commissioner Chapman with minor modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. At the time of the alleged injury by accident, the parties were subject to and bound by the provisions of the Workers' Compensation Act.
2. The employer-employee relationship existed between defendant-employer and plaintiff.
3. Crum Forster Insurance Company was the carrier on the risk.
4. Plaintiff's average weekly wage was $799.72.
5. On February 12, 2002 plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant-employer.
In addition, the parties stipulated into evidence the following:
1. Packet of medical records marked as pages 2 through 82.
2. Additional medical records submitted August 18, 2004.
In addition, the undersigned received into evidence the letter from Dr. Datyner to Mr. Goldman dated October 28, 2004 and the letter from Dr. Caines to Mr. Goldman dated November 4, 2004.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff, who was forty-nine years old at the time of the hearing before the deputy commissioner, and who has a GED, began working for defendant-employer in June 1999. The company manufactured diesel fuel tanks for trucks and buses. Plaintiff's job involved getting a cart stacked with sheets of aluminum, checking the dimensions of the sheets, flipping them over, placing them into a machine which would roll them into a cylinder, stripping off the plastic cover and then tacking the ends together with vice grips.
2. On February 12, 2002 plaintiff sustained an injury by accident arising out of and in the course of his employment when a co-worker bumped his table cart with a forklift and the table rolled against his back. At the time, plaintiff felt no discomfort, but he was sore the next day. His employer subsequently sent him to Pro Med for treatment, but the date and results of that examination may not have been disclosed by the evidence because plaintiff refused to stipulate the first page of medical notes into evidence. He was seen by a physical therapist on February 18, 2002 and treated for a lumbar strain. Dr. Madsen also saw him that day and prescribed medication for a lumbar and shoulder sprain. The doctor gave him restrictions of no bending or stooping and no lifting of more than ten pounds.
3. Plaintiff continued to perform his regular job duties, but he may not have advised his employer of his restrictions. On February 25, 2002 he returned to Dr. Madsen. Although he appeared comfortable, he complained of migratory pains. Dr. Madsen recommended exercises and hot soaks and raised his restrictions to occasional lifting up to fifty pounds. The heaviest aluminum sheet plaintiff worked with weighed twenty-eight pounds, so his regular job was within those restrictions. Plaintiff continued to receive physical therapy and on March 4, 2002 Dr. Madsen concluded that he could perform his regular job duties effective March 6, 2002. However, on March 8 plaintiff returned to the clinic and saw Dr. Rivera complaining about having been released to return to regular work. He said that his supervisor had never followed the work restrictions and that he still had low back pain. Dr. Rivera ordered more physical therapy and restricted plaintiff to occasional bending, stooping and lifting up to fifty pounds, and from working with his left arm above shoulder level. Since he worked at an adjustable table, the restrictions could easily be followed.
5. Dr. Madsen examined plaintiff again on March 11, 2002 and, because of persistent complaints, the doctor increased the work restrictions so that plaintiff would require assistance for lifting more than twenty-five pounds. Following that appointment, plaintiff took the doctor's note to Bill Somerville, the human resources manager, who instructed him to tell his supervisor. He failed to do so even when questioned by the supervisor and received a written reprimand when Mr. Somerville learned that he had refused to follow instructions.
6. Plaintiff requested a second opinion and was sent to Dr. Murrey, an orthopedic surgeon, who examined him on March 21, 2002. Dr. Murrey diagnosed him with a lumbar strain with contusion and left shoulder impingement syndrome. The doctor injected his shoulder, recommended back exercises and job coaching, and instructed him on how not to lift the sheets. Plaintiff subsequently returned to Dr. Madsen on March 25, 2002 and expressed concern about the large aluminum rolls he was required to handle. Dr. Madsen restricted him to lifting twenty-five pounds on that occasion. Plaintiff subsequently underwent job coaching by a physical therapist and on April 11, 2002 was released from medical care with no restrictions.
7. Despite plaintiff's complaints to the contrary, the company did try to accommodate his restrictions to the extent management was aware of them and gave him assistance with the large sheets when he was under the twenty-five-pound lifting restriction.
8. Plaintiff resumed his regular job duties in April 2002. On two occasions in May 2002, he was reprimanded for lack of production. On one of those occasions, there were only three tanks on the line because he was so far behind. Finally, on July 10, 2002 he allowed the line to "run dry" without notifying his supervisor. Consequently, in accordance with company policy, his employment was terminated.
9. The day after his termination, plaintiff was reevaluated by Dr. Murrey who was of the opinion that he had reached maximum medical improvement with respect to his back condition and that he had sustained no permanent partial disability. The doctor injected his shoulder and indicated that he might have to see a shoulder specialist should his shoulder symptoms persist.
10. Plaintiff, who was apparently represented by counsel at the time, then obtained a second opinion with Dr. Shaffer at the attorney's request. Dr. Shaffer examined him on September 12, 2002. Based upon the history, Dr. Shaffer concluded that the shoulder symptoms had predated the injury and did not result from the injury, so he did not address that condition. He gave plaintiff a one-percent rating to the back.
11. After his termination by defendant-employer, plaintiff had difficulty finding another full time job. He continued working in the part-time cleaning job he had previously held but finally moved to his mother's house in Virginia in December 2002. He initially worked at a Wal-Mart Store there and at a part-time cleaning job. Since he thought there was something wrong with his back which had not been diagnosed, he went to Dr. Caines, an orthopedic surgeon, on February 25, 2003. Dr. Caines ordered an MRI which showed only mild disc bulging and degenerative changes with no ruptured disc or nerve root compression. The doctor then ordered a functional capacity evaluation, which indicated that plaintiff was capable of performing medium to heavy work, so the doctor allowed plaintiff to work with no lifting of more than fifty pounds.
12. Plaintiff subsequently saw Dr. Datyner, a physiatrist, who performed an epidural steroid injection which reportedly did not give any relief. She then ordered an MRI which was essentially normal. Consequently, she had no further treatment options to offer and released plaintiff from care. Neither Dr. Datyner nor Dr. Caines thought that plaintiff sustained any permanent partial disability as a result of his injury.
13. In approximately October 2003 plaintiff obtained a job with Virginia Carolina Steel earning wages comparable to those he had earned while working for defendant-employer.
14. Since plaintiff continued working after the February 12, 2002 injury during the time he was on restrictions, he did not sustain any loss of earnings before being released to return to regular duty. He has been capable of performing his regular job duties and earning his normal wages with defendant-employer since April 11, 2002 and would have continued working for the company except that he engaged in misconduct unrelated to his injury for which he was terminated on July 10, 2002. Any other employee would have been terminated under the circumstances. Plaintiff's termination was unrelated to the injury, and plaintiff has not demonstrated that his inability to perform work assignments for the employer is a consequence of the injury.
15. Plaintiff reached maximum medical improvement by July 11, 2002 and sustained a .5% permanent partial disability to his back as a result of the injury by accident giving rise to this claim. Although defendants did not file a Form 21 agreement, they apparently paid some compensation to plaintiff after he received the rating by Dr. Shaffer.
16. Defendants failed to file a Form 19 with the Industrial Commission in this case.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. In that plaintiff was terminated for misconduct unrelated to his injury for which a non-disabled employee would have been terminated and in that he was otherwise capable of performing his regular job duties and earning his regular wages, he is not entitled to compensation for temporary total or temporary partial disability. N.C. Gen. Stat. §§ 97-29;97-30; Seagraves vs. Austin Company of Greensboro, 123 N.C. App. 228
(1996). Plaintiff has failed to demonstrate that any inability to perform work assignments was related to the injury. McRae v. Toastmaster,358 N.C. 488 (2004).
2. Plaintiff is entitled to compensation at the rate of $533.15 per week for 1.5 weeks for the .5% permanent partial disability he sustained to his back as a result of this injury by accident, but subject to a credit for compensation previously paid. N.C. Gen. Stat. §§ 97-31 (23);97-42.
3. Plaintiff is entitled to have defendants provide all authorized medical compensation arising from this injury by accident. N.C. Gen. Stat. §§ 97-2(19); 97-25.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD
1. Defendants shall pay compensation to plaintiff for permanent partial disability at the rate of $533.15 per week for 1.5 weeks subject to a credit for compensation previously paid.
2. Defendants shall pay all medical expenses incurred by plaintiff as a result of this injury by accident for authorized medical treatment.
3. Defendants shall pay the costs.
4. Defendants shall pay a penalty of $25.00 for its failure to file a Form 19 with the Industrial Commission pursuant to N.C. Gen. Stat. § 97-92.
This the 10th day of October, 2005.
 S/____________ BUCK LATTIMORE CHAIRMAN
 CONCURRING: S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER